UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

MARGARET BORRELLO,

                           Plaintiff,

v.

STATE OF NEW YORK, DEPARTMENT
OF CORRECTIONS AND COMMUNITY
SUPERVISION,

                           Defendant.

**REPORT AND
RECOMMENDATION**

17-CV-00919(JLS)(JJM)

---

      Plaintiff, Margaret Borrello, commenced this action against the defendant State of

New York, Department of Corrections and Community Supervision ("DOCCS") alleging

violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§2000e *et seq.* ("Title VII").

Before the court is DOCCS' motion for summary judgment [19], which has been referred to me

for initial consideration [5].[1]   Having reviewed the parties' submissions [19, 25, 28], I

recommend that the motion be granted.

## BACKGROUND

      Plaintiff is a Caucasian female with a long history of employment of DOCCS as a

dental assistant at the Lakeview Shock Correctional Facility.  Plaintiff's Statement pursuant to

Fed. R. Civ. P. ("Rule") 56 [25-2], ¶¶4, 5-6, 10.  Tara Ley, the dental hygienist

at Lakeview, is also a Caucasian female and a long-time employee of DOCCS. Id. ¶¶15-16, 18-

20.[2] Dr. Surendra Pattathan, a dentist, began working part-time at Lakeview in the summer of

---

[1]     The case was originally assigned to District Judge Lawrence J. Vilardo, who referred the case to
me to hear and report on dispositive motions [5].  After DOCCS' motion was filed and briefed, the case
was reassigned to District Judge John L. Sinatra, Jr. [29].

[2]     Ms. Ley, who is represented by the same counsel as plaintiff, filed an action against DOCCS with
very similar allegations (Tara Ley v. State of New York, Department of Corrections and Community

2014.  Id., ¶23. Dr. Pattathan, who is of Indian national origin, was plaintiff's and Ms. Ley's

direct supervisor. Id., ¶¶24.  During the relevant period, there were no other employees in

Lakeview's dental clinic. Plaintiff's deposition transcript [25-3], p. 203.[3] For a brief period,

when Dr. Pattathan was working in a part-time capacity, Dr. Thomas Sabuda was the other part-

time dentist. Ley's deposition transcript [25-3], pp. 229-30. According to Ms. Ley, when Dr.

Pattathan began working at Lakeview, Dr. Ronald Hellert, DOCCS' Regional Dental Director,

told her and plaintiff to "basically train him". Plaintiff's Statement pursuant to Rule 56 [25-2],

¶¶28, 31.

        Plaintiff alleges that Dr. Pattathan subjected her to race and gender discrimination

upon the commencement of his employment by "bark[ing] orders", not using her first name or

title, making demeaning comments such as "be quiet, no talking", and refering to her and Ms.

Ley as "you people". Id., ¶¶44-47, 50-51.  She maintained daily notes, and claims that every

instance of race and gender discrimination that she experienced is included in her Complaint.

Id., ¶¶56-57; plaintiff's deposition transcript [25-3], p. 321.  While the discrimination allegedly

began in the summer of 2014 at the commencement of Dr. Pattathan's employment at Lakeview,

as set forth below, the first specific allegations of discriminatory conduct occurred in December

2014, and continued through plaintiff's transfer to Collins Correctional Facility approximately a

year later.

---

Supervision, 17-CV-00918). Although the cases were never formally consolidated, a Report and
Recommendation is being simultaneously filed in that case addressing DOCCS' motion for summary
judgment.

[3]     The docket entry of plaintiff's exhibits [25-3] includes a litany of exhibits totaling 799 pages.
Plaintiff's and Ms. Ley's deposition transcripts are the second and third exhibits and my page references
are to the transcript pagination, rather than the CM/ECF numbering.

**December 2014**

On December 14, 2014, a meeting was conducted with the dental clinic staff and others including Dr. Hellert, DOCCS' Regional Dental Director, and Sherry Tarbell, Lakeview's Deputy Superintendent of Administration ("DSA"), to address Dr. Pattathan's allegation that plaintiff and Ms. Ley were always yelling at him and telling him what to do. Plaintiff's Statement pursuant to Rule 56 [25-2], ¶¶118-22, 126; [25-3], p. 669 of 799 (CM/ECF).  In response to those allegations, plaintiff explained that they were not yelling at Dr. Pattathan, but needed to raise their voices to be heard because he shouted at them. Id., ¶128. To the extent he construed that as yelling, plaintiff apologized. Plaintiff's deposition transcript [25-3], p. 70. Referring to plaintiff and Ms. Ley, Dr. Hellert told Dr. Pattathan that the "girls had many years experience working in a jail with inmates and that he should heed [their] advice". Id., p. 69.[4]

After the meeting, Dr. Pattathan loudly slammed cabinet doors and refused to speak to plaintiff.  Plaintiff's Statement pursuant to Rule 56 [25-2], ¶95; Complaint [1], ¶26.  On December 30, 2014, Dr. Pattathan allowed an inmate to sing while waiting for treatment. Plaintiff's Statement pursuant to Rule 56 [25-2], ¶130.  When plaintiff informed him that this was not acceptable behavior in the facility, he interrupted plaintiff and stated "You people make it a big deal". Id., ¶131.

---

[4]     Dr. Sabuda (the other dentist that was working in the clinic at the commencement of Dr. Pattathan's employment) also conflicted with Ms. Ley and plaintiff. In a January 22, 2015 e-mail to DSA Tarbell, he stated that Ms. Ley and plaintiff "both displayed very inappropriate behavior in front of the inmate patients and their attitude really 'sucks' at times.  They behave like piranhas feeding on the dentist when I 'screw up' (my words) . . . . These two are the biggest complainers I have ever met professionally". [25-3], p. 673 of 799 (CM/ECF). Plaintiff believed that the problems with Dr. Sabuda possibly were attributable to her gender, explaining "it's different working for a doctor . . . . [T]hey feel that we are their servants and most of us are women".  Plaintiff's deposition transcript [25-3], p. 297.

**January 2015**

On January 13, 2015, Dr. Pattathan handed plaintiff a purchase order for supplies, and when she explained that she had already made the order, he said "You people can do it then". Id., ¶132.

**March 2015**

On March 11, 2015, Dr. Pattathan directed plaintiff to clean the x-ray machine, but she refused to do so because she believed that it was belittling and disrespectful, as well as discriminatory. Id., ¶¶140, 143.  According to plaintiff, other doctors she worked with would wipe down the x-ray machine themselves after they used it. Plaintiff's deposition transcript [25-2], p. 70.  That day, Dr. Pattathan sent a memorandum to DSA Tarbell concerning the incident. By e-mail dated March 26, 2015, plaintiff informed DSA Tarbell that Dr. Pattathan had just forwarded her his March 11 memorandum, "thus creating even more hostile work environment because he doesn't communicate. Instead he forwards me emails which pertain to me". [19-3], p. 641 of 703 (CM/ECF).   She further complained that "[n]ever in my 25 year career have I ever been asked to 'clean up' after another staff person and I find this to be insulting". Id.

However, DSA Tarbell disagreed with plaintiff that Dr. Pattathan's request was inappropriate, explaining that "based on the Civil Service job description and your own performance program, it is reasonable to have you clean the equipment.  I agree that it is a simple task.  I do not agree that it is comparable to washing your own hands or that it equates to cleaning up after someone.  I have discussed it with Supt. and we feel that this is the way it should be handled . . . . We feel that cleaning and disinfecting instruments and equipment is a reasonable expectation from the Dental Assistant".  Id., p. 640 of 703.  Plaintiff believed that DSA Tarbell's response was in retaliation for her earlier complaint to Lakeview Superintendent

-4-

Malcolm Cully that DSA Tarbell had "chew[ed] her out". Plaintiff's Statement pursuant to Rule 56 [25-2], ¶¶137, 146.[5]

On March 26, 2015, Dr. Pattathan conducted a counseling session with plaintiff that emanated from February 26 and March 25, 2015 complaints she made directly to Dr. Hellert, in contravention to Superintendent Cully's direction that she follow the chain of command. [19-3], p. 642 of 703 (CM/ECF). Although the direction to discipline her came from DSA Tarbell, a Caucasian female, plaintiff believed that it was retaliation by Dr. Pattathan for writing to DSA Tarbell about her not cleaning the x-ray machine. Plaintiff's Statement pursuant to Rule 56 [25-2], ¶¶149, 151-52.

### April 2015

On April 6, 2015, plaintiff told Dr. Pattathan the correct way to change a needle count after he made an error. Id., ¶153. In response, Dr. Pattathan stated "I know what I am doing! I am the dentist. You people need to listen to me!", while waiving his arms. Id.

### June 2015

On June 17, 2015, following a disagreement between Ms. Ley and Dr. Pattathan on how to read an x-ray, Dr. Pattathan stated in plaintiff's presence, "I don't know why I bother with you people", which she believed was motivated by racial and gender discrimination. Id., ¶155. Likewise, on June 18, 2015, Dr. Pattathan stated "from here on out any medical chart I need you people will retrieve for me". Id., ¶158. When she attempted to talk to him about his

---

[5]     This was not plaintiff's first negative interaction with DSA Tabell. Similar to her allegations against Dr. Pattathan, she wrote to Dr. Hellert, Superintendent Cully and others on August 6, 2014, that DSA Tarbell "speaks to me (and other staff as I have witnessed) in an extremely rude and hostile manner. Most times she seems to be highly agitated and angry when I try to speak in a normal tone . . . . Every time I have had to deal with her she has never let me finish sentences and speaks above me . . . . I . . . fear retaliation or repercussions will be forthcoming after this memo is responded to . . . . I am currently seeking employment outside of corrections so that I do not have to deal with bullying, demeaning and unprofessional supervisors at Lakeview". [25-3], pp. 663-64 of 799 (CM/ECF).

rude and belittling manner, Dr. Pattathan stated "you people make it that way", and walked away. Id., ¶159. She also asked him if "you people" referenced white women, but he did not respond. Id., ¶160.

That day, plaintiff relayed the incident to DSA Tarbell by e-mail and noted that she believed that Dr. Pattathan's reference to "you people", implied "white women". [25-3], p. 679 of 799 (CM/ECF). She explained that Dr. Pattathan's attitude created "an unsafe and hostile environment in the dental clinic for all who work in this building". Id.

The following day, when plaintiff attempted to explain to Dr. Pattathan that he was incorrectly adding new instruments to the dental clinic inventory, he stated "no more talking", and walked away. Plaintiff's Statement pursuant to Rule 56 [25-2], ¶162. According to plaintiff, there were "[s]everal times" that Dr. Pattathan would not allow her and Ms. Ley to speak to him by yelling and telling them not to speak. Plaintiff's deposition transcript [25-3], pp. 92-93. She further stated that "[m]ore than once a week", he would walk away from her and Ms. Ley while they were mid-sentence. Id., p. 93.

Plaintiff described June 18, 2015 as a "very tough day, all morning long he was yelling and slamming cabinets and drawers and . . . he would leave the drawer open and I said, Doc, we need to close drawers so we don't trip over them because they were so low to the floor, drawers that pull out . . . . And I said, you know, we don't want anyone getting hurt inmates especially. Be quiet, do your job, no talking. A few times he told me shut up . . . . So after we were done that morning . . . I said to him . . . . [w]e need to get along. We don't have to like each other . . . . and he basically told me, you know, shut up, no talking". Id., pp. 142-43.

On June 25, 2015, Dr. Pattathan directed either plaintiff or Ms. Ley to double check that the compressor was turned off, but Dr. Hellert informed Dr. Pattathan that it was his responsibility to maintain the dental equipment. Id., ¶¶167-68.

Since Collins Correctional Facility lacked a dental assistant, in June or July, plaintiff began working there part-time at Dr. Hellert's request. Plaintiff's deposition transcript [25-3], pp. 205, 273-74. At that time, she also put in for a transfer to Collins. Plaintiff's Statement pursuant to Rule 56 [25-2], ¶278. When plaintiff worked at Collins, Ms. Ley performed some of the dental assistant duties. Plaintiff's Statement pursuant to Rule 56 [25-2], ¶203.

### July 2015

On July 14, 2015, plaintiff complained to DSA Tarbell and Dr. Hellert about some unsafe procedures performed by Dr. Pattathan during his treatment of an inmate. [25-3], p. 691 of 799 (CM/ECF). The following day, Dr. Pattathan responded to plaintiff's complaint, stating, *inter alia*, that "Assistant Borrello is not interested in performing her duties. Always talking and sometimes making derogatory remarks about me . . . when the Patient is in the chair being treated. This is unacceptable and extremely unprofessional behavior in a professional dental office". Id., p. 694 of 799.

DSA Tarbell forwarded plaintiff's complaint to Deborah Watkins, the Deputy Superintendent of Programs ("DSP") and then Acting Superintendent, noting that plaintiff had again not followed the chain of command and that she recently learned that plaintiff had ignored her directions concerning the storage and documentation of caustics. Id. When DSA Tarbell pointed this out to plaintiff, "she became belligerent, argumentative and complained and continued to talk despite at least 3 direct orders to stop talking". Id.

At some point, plaintiff had informed Dr. Pattathan that lime green water came out when she attempted to fill the autoclave. Although Dr. Pattathan told her that it was alright to use it, a subsequent July 22, 2015 inspection revealed that it was not properly sterilizing. Plaintiff's Statement pursuant to Rule 56 [25-2], ¶¶169-70. Plaintiff believed that Dr. Pattathan told her to use the autoclave because she was a Caucasian female. Id., ¶171. Likewise, on July 27, 2015, Dr. Pattathan "rewrote" a DOCCS' Directive without authority in order to permit plaintiff and Ms. Ley to sign out of his sharp instruments, which plaintiff believed was because of her race and gender, as well as retaliatory. Id., ¶¶172-74; plaintiff's deposition transcript [25-3], pp. 172-73. When plaintiff notified Dr. Hellert of this, he corrected Dr. Pattathan. Plaintiff's Statement pursuant to Rule 56 [25-2], ¶176; [25-3], p. 701 of 799 (CM/ECF).

### August 2015

On August 11, 2015, a meeting was called by the new DSA, Christine Parmerter, who was also a Caucasian female, to discuss the expectations of staff in the dental clinic. Id., ¶¶30, 179-80. During this meeting, which was also attended by Dr. Hellert, the expectation of staff and team work were stressed. Id., ¶180.

### September 2015

On September 11, 2015, plaintiff e-mailed Dr. Hellert and DSA Parmerter, explaining that plaintiff had walked around the dental clinic with an uncapped needle, which followed an incident the previous month in which Ms. Ley was stuck by a needle that had been improperly replaced by Dr. Pattathan. Id., ¶182. As a result, plaintiff requested to be excused from sitting chair side assisting Dr. Pattathan until he received proper training concerning the handling of needles, since she did "not wish to be the next person injured". [25-3], p. 720 of 799 (CM/ECF). The request, as well as a grievance filed by plaintiff concerning the incident,

were denied by DSA Parmerter.  Plaintiff's Statement pursuant to Rule 56 [25-2], ¶¶191, 194-95;

[19-3], p. 645 of 703 (CM/ECF).  Plaintiff believed that these denials by DSA Parmerter were

retaliatory. Plaintiff's Statement pursuant to Rule 56 [25-2], ¶196.

On September 24, 2015, plaintiff found unsecured and dirty dental instruments, as

well as unlocked cabinets, in the dental clinic. Id., ¶197. When she approached Dr. Pattathan

about this, he indicated that it was Ms. Ley's job. Id, ¶201.  Plaintiff acknowledged that cleaning

and disposing of used instruments were within the job duties of a dental assistant.  Id. ¶202.

However, she believed that Dr. Pattathan did not clean up because of her race and gender, and

also did so to retaliate against her for having no dental assistant while she was at Collins.  Id.,

¶¶204-05.

That day, Ms Ley attempted to relay a message from DSA Parmerter for Dr.

Pattathan to reduce the inventory of instruments in the dental clinic, but he waived her off and

went to the medical department to "hang[ ] out".  Plaintiff's deposition transcript [25-3], pp. 207-

09.  Thereafter, plaintiff e-mailed Dr. Hellert that there "is absolutely no reason why Dr.

Pattathan cannot clean up his area, record counts and wipe everything down after preforming

exams . . . . He can also conduct the tool inventory as he has been instructed. . . . Dr. Pattathan

finds time to visit in medical sometimes for a total of 3 hours out of his work day . . . . We

should not be expected to work like this . . . it's pathetic and very unprofessional. [25-3], p. 728

of 799 (CM/ECF).

On September 30, 2015, Ms. Ley received a shock from the compressor.

Although Dr. Pattathan had damaged the compressor pumps by turning them off incorrectly, he

attempted to cast blame on plaintiff and My Ley by stating that the "the girls" did not know how

to turn the pumps on and off correctly. Plaintiff's Statement pursuant to Rule 56 [25-2], ¶¶210-

11.  However, she did not believe that his statement regarding the compressor was the result of discriminatory animus or retaliation. Id., ¶214.  According to plaintiff, Dr. Pattathan regularly referred to her and Ms. Ley as the "girls". Id., ¶213.

  Sometime in September 2015, plaintiff also tried to point out to Dr. Pattathan that he was not properly stapling charts, something that could be subject to criticism on an audit. Id., ¶¶185-86. In response, Dr. Pattathan told her to be quiet and do her job, and then screamed at her.  Id., ¶187.  Plaintiff believed that Dr. Pattathan's insistence on stapling the charts incorrectly was motivated by her race and gender, and as retaliatory.  Id., ¶188.

## October 2015

  Dr. Pattathan's behavior continued into October 2015 with him referring to plaintiff and Ms. Ley as "you people", walking away while they were talking to him, and yelling. Id., ¶215. During that month, he also blamed plaintiff for having the wrong inmate produced for dental treatment, even though it was the security staff's error. Id., ¶¶217-18. Likewise, he blamed her for taking some items from his office, and had the door locks changed. Id., ¶¶222-23.  While plaintiff did not believe that this allegation was the result of discriminatory animus, she believed that it was retaliatory. Id., ¶224.

  On October 20, 2015, Dr. Pattathan issued new "General Dental Office Professional Rules" for Ms. Ley to follow, but did not know whether they were also intended to apply to her. Id., ¶225; [19-3], p. 649 of 703 (CM/ECF); plaintiff's deposition transcript [25-3], p. 222.  After this occurred, plaintiff refused to meet with Dr. Pathathan in his office, but offered to speak with him in the dental clinic at which point he stomped away. Plaintiff's Statement pursuant to Rule 56 [25-2], ¶221.

On October 21, 2015, plaintiff e-mailed DSP Watkins alleging gender discrimination, as well as retaliation. According to plaintiff, DSP Watkins responded to DSA Parmerter that "your lovelies are in cahoots". Id., ¶227. On October 22, 2015, plaintiff spoke to Captain Moss, who was investigating an inmate grievance concerning dental treatment. Id., ¶228. After Dr. Pattathan told plaintiff that she violated HIPPA by giving Captain Moss that information, Captain Moss corrected Dr. Pattathan at plaintiff's request. Id., ¶231. Later that day, plaintiff heard Dr. Pattathan yelling that she had violated HIPPA, which she believed was discriminatory and retaliatory. Id., ¶¶232-33.

Although plaintiff was previously aware that she could file a complaint of discrimination with the DOCCS' Office of Diversity Management, she did not formally do so until October 26, 2015, after she exhausted her other avenues. Id., ¶¶234-35; plaintiff's deposition transcript [25-3], p. 237.

**November 2015**

On November 3, 2015, a tool audit was conducted of the dental clinic by Lieutenant Callender, a process that was familiar to plaintiff. Plaintiff's Statement pursuant to Rule 56 [25-2], ¶¶234, 240. During the audit, plaintiff asked Dr. Pattathan if he wanted to take over. Id., ¶241. In response, Dr. Pattathan yelled in front of the audit team "you do it, it's your job". Id. Thereafter, Lieutenant Callender took plaintiff into the hallway and told her "just get me though my last tool audit". Id., ¶242. After plaintiff responded, "okay, but it's the responsibility of the department head", Lieutenant Callender told her to "get [her] ass in there and open those f### drawers". Id. Plaintiff never had previous difficulties with Lieutenant Callender and did not believe that his conduct was retaliatory or discriminatory. Id., ¶¶238, 244. In response to plaintiff's complaint about the tool audit, DSA Parmerter conducted an

investigation which concluded that she had failed to follow a direct order and neither Lieutenant Callender nor Dr. Pattathan acted inappropriately. Id., ¶245. Plaintiff believed that this was retaliatory. Id., ¶246.

The following day, plaintiff attempted to discuss with Dr. Pattathan his failure to follow proper procedure regarding the premedication of inmates. Id., ¶247. In response, he yelled "be quiet, no talking, you people interfere with my treatment", and "yes, I am concentrating on this inmate". Id.

Upon her arrival at Lakeview that summer, DSA Parmerter had directed that the dental clinic staff hold meetings on a regular basis. Id., ¶253. Notwithstanding plaintiff's request that such meetings be conducted, the first one did not occur until November 6, 2015. Id., ¶254. Although Dr. Pattathan told them to write their issues down in advance of the meeting, his response to all of their issues was that he had to speak to DSA Parmerter. Id., ¶¶255-56. During the meeting he also falsely accused plaintiff of snatching instruments from him, slamming drawers, and being rude to him. Id., ¶¶258-59, 61. The meeting concluded with Dr. Pattathan yelling at them, and thereafter he prepared inaccurate minutes of the meeting. Id. ¶¶262-63. During a subsequent dental clinic meeting on December 21, 2015, Dr. Pattathan interrupted plaintiff and Ms. Ley mid-sentence. Id., ¶290.

On November 17, 2015, Superintendent Kubik, who took over this role in August, told her that he knew that "Dr. Pattathan can be difficult, but these things take time". Id., ¶¶265-67. However, plaintiff did not know what he meant by that statement. Id., ¶268. On November 30, 2015, plaintiff was counseled by Dr. Pattathan for throwing away instruments, which she conceded was done by mistake. Id., ¶¶270-71. Plaintiff believed that the counseling memorandum was discriminatory and retaliatory, and when she brought it to Superintendent

Kubik, he stated that it was "crap". Id., ¶¶273-76. Although plaintiff asked to expedite her transfer, Superintendent Kubik informed her that he could not do that. Id., ¶277.

**December 2015**

When plaintiff observed on December 2, 2015 that Dr. Pattathan had left his keys in the drawer while working on an inmate, she took the keys and brought it to the attention of a corrections officer, which ultimately led to a sergeant responding to the dental clinic. Id., ¶¶279-81. After the sergeant left, Dr. Pattathan yelled at plaintiff "Why did you take my keys". Id., ¶282. Toward the end of her tenure at Lakeview, Dr. Pattathan would laugh every time he saw her and Ms. Ley crying, which was almost every day. Plaintiff's deposition transcript [25-3], pp. 93-94.

Plaintiff transferred to Collins on December 26, 2015. Id., pp. 291-92. After plaintiff's transfer, Ms Ley had a conversation with Dr. Hellert concerning the issues she was having with Dr. Pattathan, during which he allegedly stated, "[t]hat's their culture". Ley deposition transcript [25-3], p. 151.

During the relevant period, in e-mail exchanges between her and Ms. Ley, plaintiff:

- stated that "I can at least read the English language and be understood, one up on Dr. P [attathan]". Id., ¶317;

- referred to Dr. Pattathan as "hodgie boy" and went to dental school in "Hodgie-land". Id., ¶¶318-19;

- stated that "eventually he is going to take over Lakeview ISIS". Id., ¶322; and

- referred to him as a "jackass". Id., ¶324.

Plaintiff also acknowledged that it was generally not good practice for a dental assistant to criticize a dentist in front of a patient or to tell a dentist that he had done something

wrong. Id., ¶¶333-34.  She further conceded that she did not observe problems with Dr. Pattathan interacting with other females.  Id., ¶326.

<strong>The Charge and Complaint</strong>

On or about February 12, 2016, plaintiff filed a Charge with the New York State Division of Human Rights ("NYSDHR"), alleging discrimination and a hostile work environment based on race and gender, as well as retaliation. [19-3], pp. 680-698 of 703 (CM/ECF).  The Complaint [1] alleges seven causes of action, all pursuant to Title VII: unlawful discrimination based on gender, race and national origin  (First, Third, and Fifth Causes of Action), hostile work environment based on gender, race and national origin (Second, Fourth and Sixth Causes of Action), and retaliation.  Seventh Cause of Action.[6]

<strong>ANALYSIS</strong>

**A.    Summary Judgment Standard**

"The standards governing summary judgment are well-settled. Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Summary judgment is improper if there is any evidence in the record that could reasonably

---

[6]    Recognizing that national origin discrimination was not alleged in the Charge, plaintiff withdrew her national origin claims.  Plaintiff's Memorandum of Law [25], p. 14.

support a jury's verdict for the non-moving party." Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).

### B.    Timeliness of the Alleged Conduct

"For a Title VII claim arising in New York to be timely, a plaintiff must file the charge . . . within 300 days of the allegedly unlawful employment practice." Baroor v. New York City Department of Education, 362 Fed. App'x 157, 159 (2d Cir. 2010) (Summary Order). Consequently, DOCCS argues that "to the extent the plaintiff is making a claim for events that took place prior to [May 7, 2015 - i.e., 300 days prior to the March 2, 2016 filing],[7] they are untimely and must be dismissed". DOCCS' Memorandum of Law [19-2], p. 19. Plaintiff does not dispute that portion of the motion, and even acknowledges in the Complaint (albeit incorrectly) that her "look back" period extends back only to June 3, 2015. Complaint [1], ¶16. Therefore, I conclude that plaintiff's claims of discrimination and retaliation premised on discrete acts that occurred prior to May 7, 2015 are time-barred.

However, the entire time period of the hostile environment may be considered for the purposes of determining liability, "as long as any act contributing to the hostile work environment claim falls within the 300-day period". Zoulas v. New York City Department of Education, 400 F. Supp. 3d 25, 50 (S.D.N.Y. 2019); Baroor, 362 Fed. Appx. at 159. DOCCS recognizes this by evaluating plaintiff's hostile work environment claim based on the entirety of the alleged conduct. See DOCCS' Memorandum of Law [19-2], p. 12 (evaluating conduct occurring "over a period of roughly a year and a half").

---

[7]    Although it appears from the record that plaintiff's charge of discrimination was filed with NYSDHR in February 2016 (see [19-3], pp. 680-698 of 703 (CM/ECF)), both parties agree that it was filed on March 2, 2016.

## C.    Discrimination Based on Gender and Race

"Title VII . . . prohibits employment discrimination on the basis of race, color, religion, sex, or national origin." Ricci v. DeStefano, 557 U.S. 557, 577 (2009).  Such claims "may be proven under a disparate treatment . . . theory of liability" by demonstrating that "the defendant's actions were motivated by a discriminatory intent, either through direct evidence of intent or by utilizing the three-part burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)." Legg v. Ulster County, 820 F.3d 67, 72 (2d Cir. 2016).

Under the burden-shifting framework, the plaintiff bears the burden of establishing a prima facie case of discrimination by showing that: "1) he belonged to a protected class; 2) he was qualified for the position; 3) he suffered an adverse employment action; and 4) the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008). "Once the plaintiff has met this de minimis burden, the burden of production shifts to the employer to proffer a legitimate, nondiscriminatory reason for the adverse action." If the defendant establishes such a reason, the presumption of discrimination created by the prima facie case drops out of the analysis, and the defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination". James v. New York Racing Association, 233 F.3d 149, 154 (2d Cir. 2000). See also McDonnell Douglas, 411 U.S. at 804; Fisher v. Vassar College, 114 F.3d 1332, 1336 (2d Cir. 1997).

DOCCS moves for summary judgment on plaintiff's gender and race discrimination claims by arguing that she is unable to establish a *prima facie* case of discrimination.  Specifically, it contends that plaintiff did not suffer an adverse employment action, but that even if she did, the adverse employment action did not occur under

circumstances giving rise to an inference of discriminatory intent. DOCCS' Memorandum of
Law [19-2], pp.    7-8.

       "An adverse employment action must be more disruptive than a mere
inconvenience or an alteration of job responsibilities and might be indicated by a termination of
employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a
material loss of benefits, significantly diminished material responsibilities, or other indices
unique to a particular situation." Fox v. Costco Wholesale Corp., 918 F.3d 65, 71–72 (2d Cir.
2019). "An employer's behavior does not constitute an adverse employment action because the
employee sustained some generalized harm; the harm must be related to the employee's terms
and conditions of employment." Sosa v. New York City Department of Education, 368 F. Supp.
3d 489, 496 (E.D.N.Y. 2019). DOCCS argues that "the only action that could conceivably be
considered an adverse action is plaintiff's own request to be reassigned to another correctional
facility", but contends that this was "done of her own volition and did not come with a decrease
in salary". DOCCS' Memorandum of Law [19-2], p. 8. In response, plaintiff argues that she
was constructively forced to seek a transfer: plaintiff "felt stressed and threatened to the point
where she did not feel she could do her job and eventually applied for a transfer to another
facility in order to escape from Dr Pattathan". Plaintiff's Memorandum of Law [25], p. 10.

       "Several district courts in this Circuit and several United States courts of appeals
have applied the constructive discharge doctrine to situations where an employee voluntarily
transfers to a different position with the same employer." United States v. New York City
Department of Education, 2017 WL 435940, *7 (S.D.N.Y.), adopted, 2017 WL 1319695
(S.D.N.Y. 2017). To establish an adverse employment action based on a constructive involuntary
transfer, plaintiff must establish that "(1) she was discriminated against to the point that working

conditions were so intolerable that a reasonable person in her shoes would feel compelled to

transfer; and (2) her transfer created a materially significant disadvantage in the terms and

conditions of her employment." Id., *8. *See also* <u>Bianchi v. Rochester City School District</u>, 2019

WL 4750424, *8 (W.D.N.Y. 2019) (describing it as a "constructive demotion" theory).

However, even if plaintiff could meet the "demanding" standard of establishing

that the working conditions were so intolerable that a reasonable person would feel compelled to

transfer, <u>Miller v. Praxair, Inc.</u>, 408 Fed. Appx. 408, 410 (2d Cir. 2010) (Summary Order),[8] she

must still establish that the transfer resulted in a "materially significant disadvantage" in working

conditions - *i.e.*, "a demotion evidenced by a decrease in wage or salary, a less distinguished

title, a material loss of benefits, significantly diminished material responsibilities, or other

indices unique to a particular situation". <u>Williams v. R.H. Donnelley, Corp.</u>, 368 F.3d 123, 128

(2d Cir. 2004). Plaintiff conceded at her deposition that she continued in a full-time capacity at

Collins as a dental assistant, at the same grade, with the same duties, and the same pay.

Plaintiff's deposition transcript [25-3], pp. 17, 20-21. Although a "reduction in pay is not

required for a transfer to be an adverse employment action", <u>New York City Department of</u>

<u>Education</u>, 2017 WL 435940, at *8, since plaintiff neither points to any evidence nor makes any

argument that the transfer resulted in a materially significant disadvantage, I conclude that

plaintiff's voluntary transfer did not constitute an adverse employment action.

Likewise, the two counseling memoranda issued by Dr. Pattathan fail to constitute

adverse employment actions. It is well settled that "negative performance evaluations, formal

---

[8]    *See, e.g.*, <u>Bianchi</u>, 2019 WL 4750424, *8 ("because Bianchi has not made out a hostile work environment claim, he cannot satisfy the even more demanding standard for a constructive demotion claim").

reprimands, and counseling memoranda are not adverse employment actions for purposes of a disparate treatment claim unless accompanied by negative repercussions such as reduction in pay or an injury to a plaintiff's ability to secure future employment". Babarinsa v. Kaleida Health, 58 F.Supp.3d 250, 260 (W.D.N.Y. 2014), aff'd, 622 Fed. Appx. 36 (2d Cir. 2015) (Summary Order). This holds true "[e]ven if the information in the counseling memoranda was false or misleading". Ziyan Shi v. New York Department of State, Division of Licensing Services, 393 F. Supp. 3d 329, 338 (S.D.N.Y. 2019). Here, plaintiff points to no repercussions, mush less negative ones, arising from the counseling memoranda. Hence, the two counseling memoranda, - the first of which came at the direction of DSA Tarbell, a Caucasian female, and the second of which was predicated on conduct (i.e., throwing away instruments) that she acknowledged committing - do not rise to the level of adverse employment actions.

Furthermore, as DOCCS argues, to the extent that Dr. Pattathan "was rude and yelled at and belittled her", it is "well settled that reprimands, closer monitoring, being yelled at, and unfair criticism do not amount to adverse actions". DOCCS' Memorandum of Law [19-2], p. 8. There is no evidence that Dr. Pattathan's conduct had a tangible effect on plaintiff's employment status. Even "[h]arsh reprimands do not rise to the level of an adverse employment action where there is no tangible effect on employment." Fox, 918 F.3d at 72. Likewise, "being yelled at, receiving unfair criticism, receiving unfavorable schedules or work assignments do not rise to the level of adverse employment actions because they do not have a material impact on the terms and conditions of Plaintiff's employment." Smalls v. Allstate Insurance Co., 396 F. Supp. 2d 364, 371 (S.D.N.Y. 2005). See also Chukwuka v. City of New York, 795 F.Supp.2d 256, 262 (S.D.N.Y. 2011), aff'd, 513 Fed. Appx. 34 (2d Cir. 2013) (Summary Order) ("reprimands, threats of disciplinary action and excessive scrutiny do not constitute adverse

employment actions in the absence of other negative results such as a decrease in pay or being

placed on probation"); <u>Davis v. NYS Department of Corrections Attica Correctional Facility</u>

<u>P.O. Box 149 Attica, N.Y. 14001</u>, 46 F. Supp. 3d 226, 236 (W.D.N.Y. 2014) ("[u]nfair criticism

and other unpleasant working conditions are not adverse employment actions"); <u>Adams-Martin</u>

<u>v. Connecticut Department of Developmental Services</u>, 2012 WL 878306, *9 (D. Conn. 2012)

("allegedly unfair or excessive monitoring, even when accompanied by verbal reprimands, is not

an adverse employment action without accompanying negative results").

Ultimately, "[t]he conduct that Plaintiff describes, despite the significant impact

that she alleges it had on her physical and mental health, does not rise to such a level as to

constitute a 'materially adverse change in the terms and conditions of Plaintiff's employment.'"

<u>Sosa</u>, 368 F. Supp. 3d at 496 (*quoting* <u>Galabya v. New York City Board of Education</u>, 202 F.3d

636, 640 (2d Cir. 2000)). Plaintiff has pointed to no other adverse employment action. Therefore,

I recommend that this claim be dismissed.[9]

**D.    Hostile Work Environment Based on Gender and Race**

"To prove a hostile-work-environment claim, a plaintiff must show that the

complained-of conduct (1) is objectively severe or pervasive in that it creates an environment

that a reasonable person would find hostile or abusive; (2) creates an environment that the

plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment

because of the plaintiff's protected characteristic." <u>Figueroa v. Johnson</u>, 648 Fed. App'x 130, 134

(2d Cir. 2016) (Summary Order).  Although "[c]ourts in this Circuit have recognized that a

---

[9]     Since I have concluded that there was no adverse employment action, it is unnecessary for me to address whether the adverse actions took place under circumstances giving rise to an inference of discrimination.

plaintiff's burden is 'remarkably high'" Epstein v. County of Suffolk, 2016 WL 4257349, *6 (E.D.N.Y. 2016), "[t]he environment need not be unendurable or intolerable". Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003).

The Second Circuit has recognized that "hostile work environment claims present mixed question] of law and fact that are especially well-suited for jury determination", and that "summary judgment is appropriate only where application of the law to those undisputed facts reasonably support only one ultimate conclusion". Schiano v. Quality Payroll Systems, Inc., 445 F.3d 597, 605 (2d Cir. 2006). Nevertheless, "[t]here are, of course, cases in which it is clear . . . that after assessing the frequency of the misbehavior measured in light of its seriousness, the facts cannot, as a matter of law, be the basis of a successful hostile work environment claim", since it remains "the law of this Circuit that summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact and may be appropriate even in the fact-intensive context of discrimination cases". Id. at 608.

In order to survive a motion for summary judgment, "a plaintiff must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment". Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 69 (2d Cir. 2000). "There is no 'mathematically precise test' . . . for deciding whether an incident or series of incidents is sufficiently severe or pervasive to alter the conditions of a plaintiff's working environment." Raspardo v. Carlone, 770 F.3d 97, 114 (2d Cir. 2014) (quoting Harris v. Forklift Systems, Inc., 510 U.S. 17, 22-23 (1993)). "Instead, courts must assess the totality of the circumstances, considering elements such as 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and

whether it unreasonably interferes with an employee's work performance.'" Id. (quoting Harris, 510 U.S. at 23). See also Mento v. Potter, 2012 WL 1908920, *14 (W.D.N.Y. 2012) ("courts should not carve the work environment into a series of discrete incidents and then measure the harm occurring in each episode"). The totality of the circumstances may include facially neutral incidents, "so long as a reasonable fact-finder could conclude that they were, in fact, based on [a protected characteristic]." Moll v. Telesector Resource Group, Inc., 760 F.3d 198, 203 (2d Cir. 2014). "But this requires some circumstantial or other basis for inferring that incidents . . . neutral on their face were in fact discriminatory." Alfano v. Costello, 294 F.3d 365, 378 (2d Cir. 2002).

In reviewing the totality of the evidence, I am "mindful that Title VII does not establish a 'general civility code' for the American workplace". Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004) (quoting Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 81 (1998)). "Hostile work environment claims are meant to protect individuals from abuse and trauma that is severe. They are not intended to promote or enforce civility, gentility or even decency." White v. Fuji Photo Film USA, Inc., 434 F. Supp. 2d 144, 154–55 (S.D.N.Y. 2006); Piccone v. Town of Webster, 2011 WL 3322550, *17 (W.D.N.Y. 2011), aff'd, 511 Fed. App'x 63 (2d Cir. 2013) ("it must be borne in mind that Title VII . . . [was] not intended to sterilize employee relations or to create a generalized code of workplace civility"). See also Meritor Savings Bank v. Vinson, 477 U.S. 57, 67 (1986) ("not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII"); Marcus v. Barilla America NY, Inc., 14 F. Supp. 3d 108, 114 (W.D.N.Y. 2014) (Title VII is not a "general civility code[ ] requiring supervisors to engage in unfailingly decorous or diplomatic conduct, and they do not empower courts to act as super-personnel

departments, poised to question the reasonableness or fairness of every supervisor-employee interaction").

DOCCS argues that plaintiff cannot establish that the conduct was severe or pervasive, or that the alleged harassment was due to her race or gender. DOCCS' Memorandum of Law [19-2], pp. 12-14. As to whether the conduct was pervasive, it contends the alleged events "occurred, at most, a few times a month, over a period of roughly a year and a half". Id., p. 12. Concerning its severity, DOCCS argues that "most of what the plaintiff alleges is not severe at all. While the plaintiff does make allegations of yelling, most of the events complained of involve Dr. Pattathan ignoring the plaintiff and Ms. Ley or telling them to stop talking. None of Dr. Pattathan's conduct can be interpreted as threatening." Id. It also emphasizes that "many, if not most, of the plaintiff's allegations of [hostile work environment] arose in response to plaintiff, or Ms. Ley, initially criticizing Dr. Pattathan for his alleged violation of DOCCS' protocol or dental standards" suggesting that the conduct was "not caused by the dentist's illegal bias but the plaintiff's disregard for the dentist's abilities (or worse, her own bias against people from 'Hodgie land')", and that "many of the plaintiff's allegations concern things she just did not like, such as the dentist's treatment of inmates or his way of laying out instruments (which made her feel unsafe)". Id., p. 13.

Plaintiff responds that she was "subjected to a range of hostile behaviors including Dr. Pattathan['s] violation [of] direct orders from his superiors, and his utter refusal to pay attention to her advice as a long serving member of the DOCCS dental program even though he had been ordered to do so". Plaintiff's Memorandum of Law [27], p. 14. She further contends that Dr. Pattathan's "demeaning and degrading remarks were constant and including yelling at her and calling her 'you people'" and "walking away from [her] when [she was] in mid-sentence

and not allowing [her] to speak". Plaintiff's Memorandum of Law [25], pp. 15-16 (emphasis in original).

Viewing the totality of the alleged conduct relied upon by plaintiff, she has not presented evidence sufficient for a reasonable juror to conclude that the conduct rose to the requisite level of severity or pervasiveness. The only objectionable conduct plaintiff identifies that is connected to her race or and gender is Dr. Pattathan's use of the phrase "you people". "Although clearly inappropriate, [these] statements - even if racially charged - in no way approach the bar set for this type of cause of action." Pitts v. Howard University, 111 F. Supp. 3d 9, 25 (D.D.C. 2015). See also Bowden v. Clough, 658 F. Supp. 2d 61, 81 (D.D.C. 2009) ("[w]hile being 'subjected to the phrase 'you people'' by a supervisor may be 'rude and insensitive,' '[such] comments and incidents do not describe a hostile environment under Title VII'").

In the context of the other alleged conduct relied upon by plaintiff, these comments demonstrate that Dr. Pattathan did not treat plaintiff well. However, it does not rise to the level necessary to maintain her claim. See Liburd v. Bronx Lebanon Hospital Center, 2009 WL 900739, *1, 8 (S.D.N.Y. 2009), aff'd, 372 Fed. Appx. 137 (2d Cir. 2010) (Summary Order) (concluding that referring to the plaintiff as "black ass" on several occasions, "in the context of [the supervisor's other alleged conduct, such as ignoring Plaintiff, monitoring her whereabouts, etc., the evidence merely shows that Esteves did not treat her well; it does not, however, rise to the level necessary to make out a hostile work environment claim").

Since Title VII is not intended as a general civility code, rude and boorish behavior, such as "persistent shouting and a display of poor temperament are insufficient to state a plausible hostile-environment claim". Faison v. Leonard St., LLC, 2009 WL 636724, *4

(S.D.N.Y. 2009). *See* <u>Tillman v. Luray's Travel</u>, 137 F. Supp. 3d 315, 335 (E.D.N.Y. 2015) (where the plaintiff, a bus driver, alleged, *inter alia*, that "the shop manager addressed him with a 'belligerent and hostile, vulgar' tone", "gave [him] looks indicating his dislike", and "provided with 'bad busses' that frequently experienced mechanical failures", the court concluded that even if the plaintiff "had adduced some evidence that his treatment was based on his race, his allegations are simply not objectively substantial enough to classify . . . as a hostile work environment", since "Title VII 'does not set forth a general civility code for the American workplace'"); <u>Marcus</u>, 14 F. Supp. 3d at 114 (allegations that the plaintiff's supervisor "was critical of her performance, openly disagreed with her concerning certain work-related issues, 'yelled' at plaintiff and accused her of being 'the only one stopping the bus' and hindering the plant's progress when she identified safety or quality issues" did not plausibly allege conduct approaching a hostile work environment). Similarly, "being ignored by one's supervisor is simply not sufficiently severe to move beyond the mere tribulations of a workplace environment". <u>Bailey v. International Paper</u>, 2012 WL 405713, *3 (D.S.C. 2012).

Hence, the "several" instances of Dr. Pattathan refusing to permit plaintiff to speak and his more frequent habit of walking away while plaintiff was mid-sentence (plaintiff's deposition transcript [25-3], pp. 92-93), while certainly ill-mannered, are insufficient to create a hostile work environment. *See* <u>Isbell v. City of New York</u>, 316 F. Supp. 3d 571, 592 (S.D.N.Y. 2018) (concluding that allegations "of heavy scrutiny and criticism, discipline for inadequate work product, refusal to authorize overtime, use of a 'harsh and sarcastic tone,' refraining from communicating with Plaintiffs, denying Plaintiffs use of the DOC vehicle, and denying Plaintiffs

training opportunities" did not state a claim for a hostile work environment); Liburd, 2009 WL 900739, *8. [10]

Even considering among the totality of the circumstances plaintiff's additional claims - *none of which she relies on in responding to DOCCS' motion* - that Dr. Pattathan made false allegations against her and laughed at her, these too fail to establish a hostile work environment.[11] See Clarke v. InterContinental Hotels Group, PLC, 2013 WL 2358596, *10 (S.D.N.Y. 2013) ("[p]laintiff has alleged that during the entirety of her time in the Sales & Marketing Department, her supervisors snubbed her; spoke to her rudely . . . and insulted her worth ethic; excessively scrutinized her work; and gave her more work to do than other employees. Standing alone, these allegations do not plausibly point to a work environment that is sufficiently abusive to constitute a hostile workplace"); Trachtenberg v. Department of Education of City of New York, 937 F. Supp. 2d 460, 472–73 (S.D.N.Y. 2013) (the plaintiff's allegations that during the last two years of her employment as a teacher "she was subjected to excessive scrutiny; [her] principal . . . would 'frequently stand in the area and stare at [her] in an effort to intimidate her'; she received negative performance evaluations and letters from [her principal that contained 'scurrilous charges'; she was moved to a poorly ventilated, windowless

---

[10]     I do not question whether plaintiff was subjectively affected by Dr. Pattathan's conduct.

[11]     Although further supportive of my conclusion, in giving plaintiff every favorable inference (as I must), I have ignored the evidence indicating that she had her own discriminatory animus toward Dr. Pattathan (plaintiff's Statement pursuant to Rule 56 [25-2], ¶¶317, 318-19, 322, 324), that many of these incidents were triggered by plaintiff telling Dr. Pattathan that he did something wrong, conduct she acknowledged was generally not good practice for a dental assistant (id., ¶¶333-34), that plaintiff did not observe problems with Dr. Pattathan's interactions with other women (id., ¶326), and that she experienced similar conflict with Dr. Sabuda and DSA Tarbell. [25-3], pp. 663-64, 673 of 799 (CM/ECF). In giving plaintiff every favorable inference, there are several race and gender-neutral incidents plaintiff attributes to discrimination that appear to have no nexus whatsoever. For example, plaintiff attributes Dr. Pattathan's direction that she continue to use an autoclave after she brought it to his attention that it was broken and his failure to staple charts correctly to race and gender discrimination. Plaintiff's Statement pursuant to Rule 56 [25-2], ¶¶171, 188. In any event, these incidents are sufficiently minor so as to not sway my determination when viewed in the totality of the circumstances.

office; and she was refused training opportunities" were determined to "fall well short of the sort

of conduct that courts have found sufficiently pervasive to alter the conditions of the victim's

employment"); Nwanji v. City of New York, 2000 WL 1341448, *5 (S.D.N.Y. 2000) (even if

there was evidence that the plaintiff's supervisors' conduct of "constantly reprimanding him and

documenting his poor work performance" was motivated by discriminatory animus, this

evidence was insufficient to establish a hostile work environment claim).

        Although hostile work claims are evaluated on a case-by-case basis and are

"especially well-suited for jury determination", Schiano, 445 F.3d at 605, several Second Circuit

opinions addressing similar alleged conduct provide useful guideposts in assessing the conduct at

issue here.  For example, in Davis-Molinia v. Port Authority of New York & New Jersey, 2011

WL 4000997, *11 (S.D.N.Y. 2011), aff'd, 488 Fed. App'x 530 (2d Cir. 2012), the Second

Circuit affirmed the district court's grant of summary judgment dismissing the two co-plaintiffs'

hostile work environment claims, where over two months, one plaintiff's supervisor denied  him

time off and told "him to never ask for [it]  again", stated that he "would never see vacation

again",  took away his job responsibilities and excluded him from important meetings", "yelled

at him in front of staff to get out when he showed up at meetings", "made [him] stay until 4pm

but not others", "harassed him more after he complained", and "had him brought up on

disciplinary charges". 2011 WL 4000997, *11. Similarly, the other plaintiff's supervisors over

the course of several years "excluded her from staff meetings that concerned her job functions

and duties", "refused to greet her in the morning and would walk around the opposite way to his

office to avoid her", "talked to her in [a] nasty way", "diminished her responsibilities and gave

them to the clerks", "yell[ed] and talk[ed] down to her like she was an idiot when mistakes were

made by others", "belittled her by telling her that her position was the same as a particular lower-

ranked position", and "made it difficult for her to do her job" by failing to "intervene when a particular lower-ranked supervisor refused to give her documents she needed". Id. Under these circumstances, the district court concluded that "[n]o reasonable juror could find that either Plaintiff was subjected to conduct that was sufficiently severe or pervasive, either in isolation or when viewed as a whole, to create a hostile work environment", explaining that "[t]he gravamen of their claims is rooted in conduct that amounts to nothing more than workplace dynamics". Id.

Likewise, in Liburd, supra, the plaintiff's supervisor referred to the plaintiff as "black ass" on several occasions, "ignored and spoke to her harshly at meetings", "scolded her for not following the chain of command", "threatened transfer to another department", "gave her extra duties . . . [and] stripped her of certain duties, "closely monitored her", and "gave unrealistic time periods" to complete work. 2009 WL 900739, *1. In affirming the District Court's determination, the Second Circuit found that this course of conduct was "not sufficient to raise a genuine issue to be tried as to severity or pervasiveness notwithstanding the crude and contemptible character of what is alleged". Liburd, 372 Fed. App'x at 140.

Faced with similar allegations in Fleming v. MaxMara USA, Inc., 371 Fed. App'x 115, 119 (2d Cir. 2010) (Summary Order), that "defendants wrongly excluded [the plaintiff] from meetings, excessively criticized her work, refused to answer work-related questions, arbitrarily imposed duties outside of her responsibilities, threw books, and sent rude emails to her", the Second Circuit concluded that these incidents did support a finding of a hostile work environment that was pervasive or severe.

Even at the dismissal stage, the Second Circuit has found similar allegations to be insufficient to establish severe or pervasive conduct. For example, in Littlejohn v. City of New York, 795 F.3d 297, 321 (2d Cir. 2015), the Second Circuit concluded that the following alleged

conduct was not sufficient to be considered severe or pervasive:  the plaintiff's supervisor "made

negative statements" about the plaintiff to others; "was impatient and used harsh tones" with

him; "distanced herself from [the plaintiff] when she was nearby"; "declined to meet with [the

plaintiff]"; "replaced [the plaintiff] at meetings"; "wrongfully reprimanded [the plaintiff]";

"increased [the plaintiff's] reporting schedule"; and made sarcastic comments.  *See also* Harvin

v. Manhattan & Bronx Surface Transit Operating Authority, 767 Fed. App'x 123, 128 (2d Cir.

2019) (Summary Order) ("[r]un-of-the-mill workplace conflicts, troubling though they may be,

do not rise to the level of an objectively hostile workplace . . . . Harvin alleged that Moore and

Amerson were rude and hostile on various occasions, but these incidents reflect only fraught

relationships with her supervisors. Further, only two of the many incidents could have referred to

Harvin's disability, which is insufficient to state a claim for hostile work environment").

        The alleged conduct at issue here is comparable to (and not appreciably different)

from what the plaintiffs in Davis-Molinia, Liburd, Fleming, and Littlejohn allegedly

experienced.  Plaintiff makes no attempt to address, much less distinguish, the cases relied upon

by DOCCS, including Littlejohn.  Nor does she cite any cases where comparable or less

offensive conduct was sufficient to survive summary judgment.  Viewing the totality of the

circumstances, the collective conduct plaintiff experienced and attributes to race and gender

discrimination was not objectively sufficiently severe or pervasive to alter the conditions of

plaintiff's working environment.[12] Therefore, I recommend that this claim be dismissed.

---

[12]    Based on this conclusion, it is unnecessary for me to address whether the alleged harassment was
because of her gender or race (*see* Risco v. McHugh, 868 F. Supp. 2d 75, 117 (S.D.N.Y. 2012) ("[e]ven if
Risco had offered some proof that Byrd's conduct was motivated by racial animus, she cannot establish
the existence of a hostile environment")), or DOCCS' alternative argument that there is no basis for
attributing the conduct to it, since it made complaint avenues available to its employees to complain of
discrimination, which plaintiff was aware of, but she failed to utilize those until October 26, 2015.
DOCCS' Memorandum of Law [19-2], pp. 19-20.

**E.    Retaliation**

Retaliation claims under Title VII are also analyzed pursuant to the <u>McDonnell</u> <u>Douglas</u> burden-shifting evidentiary framework. *See* <u>Littlejohn</u>, 795 F.3d at 315. "Under this framework, the plaintiff bears the initial burden to establish a prima facie case of retaliation by offering evidence that she participated in a protected activity, suffered an adverse employment action, and that there was a causal connection between her engaging in the protected activity and the adverse employment action. This showing creates a presumption of retaliation, which the defendant may rebut by articulating a legitimate, non-retaliatory reason for the adverse employment action. If the defendant provides such an explanation, the presumption of retaliation dissipates, and the plaintiff must prove 'that the desire to retaliate was the but-for cause of the challenged employment action.'" <u>Ya-Chen Chen v. City University of New York</u>, 805 F.3d 59, 70 (2d Cir. 2015) (*quoting* <u>University of Texas Southwestern Medical Center v. Nassau</u>, 570 U.S. 338, 352 (2013)).

DOCCS challenges plaintiff's ability to establish a protected activity prior to October 26, 2015, and to meet the other elements of her *prima facie* showing.  DOCCS' Memorandum of Law [19-2], pp. 16-18.

**1.    Protected Activity**

"Protected activities include oppos[ing] an act or practice of discrimination based upon race, color, religion, sex, national origin, age or disability". <u>Herbert v. Delta Airlines</u>, 2014 WL 4923100, *4 (E.D.N.Y. 2014). Although "[g]eneralized complaints about the workplace do not qualify as a protected activity", anything that an "employer could reasonably have understood . . . was complaining about . . . discrimination" constitutes a protected activity.

Deuel v. Town of Southhampton, 2015 WL 4394085, *8 (E.D.N.Y. 2015). "While . . . a plaintiff need not explicitly allege a violation of Title VII for . . . her conduct in making a complaint about working conditions to be considered protected activity . . . the plaintiff must complain of discrimination in sufficiently specific terms so that the employer is put on notice that the plaintiff believes he or she is being discriminated against on the basis of race, gender, national origin, or any other characteristic protected by Title VII." Brummell v. Webster Central School District, 2009 WL 232789, *6 (W.D.N.Y. 2009).

DOCCS argues that while plaintiff and Ms. Ley "made multiple complaints about Dr. Pattathan to their superiors, as well as to his", that it was "not until October 26, 2015" that she first complained about gender discrimination. DOCCS' Memorandum of Law [19-2], p. 16. Therefore, it contends that all prior complaints should not be considered protected activities. Id. In response, plaintiff alleges that she "specifically complained about his discriminatory behavior against Caucasian females". Plaintiff's Memorandum of Law [25], p. 17. Although plaintiff does not cite to it, this is borne out by her June 18, 2015 e-mail to DSA Tarbell, in which she complained that Dr. Pattathan's frequent use of the term "you people", referred to "white females" and that such a phrase created a hostile work environment. [25-3], p. 679 of 799 (CM/ECF).

## 2.    Adverse Action/Causal Connection

Plaintiff does not identify any particular alleged adverse actions or causal links to her protected activity. Instead, relying on the alleged hostile work environment she experienced, plaintiff alleged in her Complaint ([1], ¶137) and argues in response to DOCCS' motion that "Dr. Pattathan engaged in an *ongoing* pattern of discriminatory practices against Plaintiff, including, without limitation, unwarranted criticism of h[er] job performance; interference with

-31-

her ability to perform her duties, failure to properly assign work, assignment of the Plaintiff to lower jobs that were both outside of her job description". Plaintiff's Memorandum of Law [25], p. 18 (emphasis added). Therefore, I construe plaintiff's claim as asserting a retaliatory hostile work environment claim. *See* Joseph v. Brooklyn Developmental Disabilities Services Office, 2016 WL 6700831, *30 (E.D.N.Y. 2016) ("[g]iven that the discriminatory treatment on which Plaintiff bases his retaliation claim is the same conduct underlying his hostile work environment claim, the Court construes Plaintiff's claim as one for retaliatory hostile work environment").

   "To establish that a retaliatory hostile work environment constitutes a materially adverse change that might dissuade a reasonable worker from reporting activity prohibited by Title VII, a plaintiff must satisfy the same standard that governs hostile workplace claims by showing that the incidents of harassment following complaints were sufficiently continuous and concerted to have altered the conditions of [her] employment. . . . Further, to demonstrate causation between the protected activity and hostility, the plaintiff must establish some increase in the discrimination or harassment - either a ratcheting up of the preexisting behavior, or new, additional forms of harassment." Olsen v. Suffolk County, 2016 WL 5395846, *14 (E.D.N.Y. 2016). "If, however, the discrimination was just as bad before the employee complained as it was afterwards, then the employee's complaints cannot be said to have led to that discriminatory behavior." Bacchus v. New York City Department of Education, 137 F. Supp. 3d 214, 245 (E.D.N.Y. 2015).

   Here, DOCCS argues that there can be no causal connection, since "[i]f Plaintiff is to be believed, there was no change in the way she was treated after she filed her complaints of discrimination". DOCCS' Memorandum of Law [19-2], p. 18. In response, plaintiff argues that

"the *continuing* intimidation and insulting behavior *continued*" - not that it changed or intensified.  Plaintiff's Memorandum of Law [25], p. 19 (emphasis added).

Plaintiff further argues that DOCCS failed to stop Dr. Pattathan "from continuing his insults and discriminatory practices". Id., p. 18.[13] In Fincher v. Depository Trust and Clearing Corp., 604 F.3d 712, 721 (2d Cir. 2010), the Second Circuit held that "an employer's failure to investigate a complaint of discrimination cannot be considered an adverse employment action taken in retaliation for the filing of the *same* discrimination complaint", explaining that "[a]n employee whose complaint is not investigated cannot be said to have . . . suffered a punishment for bringing that same complaint: Her situation in the wake of her having made the complaint is the same as it would have been had she not brought the complaint or had the complaint been investigated but denied for good reason or for none at all" (emphasis added). However, the court noted that a failure to investigate may constitute an adverse employment action "if the failure is in retaliation for some *separate*, protected act by the plaintiff." Id. at 722 (emphasis added).[14]

Here, plaintiff does not allege that DOCCS "failed to investigate in response to a separate, protected act, but rather premises his claim on Defendants generally 'ignoring [his] complaints of discrimination'". Rogers v. Fashion Institute of Technology, 2016 WL 889590, *5 (S.D.N.Y. 2016). See also Williams v. Columbia University, 2012 WL 3879895, *4 (S.D.N.Y.

---

[13]     In response to DOCCS' motion, plaintiff does not rely on any alleged independent acts of retaliation by DSA Tarbell or others.

[14]     By example, in Fincher, the Second Circuit cited to Rochon v. Gonzales, 438 F.3d 1211, 1219-20 (D.C. Cir. 2006), where an employer failed to investigate an employee's complaint of a death threat against him, in retaliation for an earlier complaint of discrimination filed by the same employee. Since the initial discrimination complaint resulted in a separate retaliatory failure to investigate the subsequent death threat, the D.C. Circuit concluded that the employee stated a claim for retaliation under Title VII. Id.

2012) ("even assuming that Williams did complain about new retaliatory acts, these complaints were not 'separate' from her earlier complaints because they related to a single alleged retaliatory scheme. Williams's claim that Columbia failed to investigate certain aspects of the scheme in retaliation for her earlier complaints about other aspects of the same scheme is barred by Fincher"); Strujan v. Teachers College Columbia University, 2010 WL 3466301, *10 (S.D.N.Y.), adopted, 2010 WL 3466251 (S.D.N.Y. 2010) ("[a]lthough the letters plaintiff wrote to Teachers College and Columbia's American Language program complaining of discrimination might be construed as protected conduct . . . the only activity plaintiff complains of subsequent to her writing those letters is defendants' failure to respond to those complaints and to subsequent complaints. This failure to respond does not constitute actionable retaliatory conduct because it would not deter a reasonable person from making a complaint of discrimination"); Hong Yin v. North Shore LIJ Health System, 20 F. Supp. 3d 359, 374 (E.D.N.Y. 2014) ("an employer's failure to investigate discrimination claims is not an adverse employment action"). Therefore, I recommend that this claim also be dismissed.


## CONCLUSION

For these reasons, I recommend that DOCCS' motion for summary judgment [21] be granted. Unless otherwise ordered by District Judge Sinatra, any objections to this Report and Recommendation must be filed with the clerk of this court by March 25, 2020. Any requests for extension of this deadline must be made to District Judge Sinatra. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated:  March 11, 2020

JEREMIAH J. MCCARTHY
United States Magistrate Judge